# No. 23-2246

**IN THE UNITED STATES COURT OF APPEALS
FOR THE EIGHTH CIRCUIT**

————————

**MAYO CLINIC, a Minnesota Corporation, on its own behalf and
as successor in interest to Mayo Foundation,**

*Plaintiff-Appellee*

v.

**UNITED STATES OF AMERICA,**

*Defendant-Appellant*

————————

**ON APPEAL FROM THE JUDGMENT OF THE UNITED STATES
DISTRICT COURT FOR THE DISTRICT OF MINNESOTA**

————————

**BRIEF FOR THE APPELLANT**

————————

DAVID A. HUBBERT
  *Deputy Assistant Attorney General*

FRANCESCA UGOLINI                     (202) 514-3361
JUDITH A. HAGLEY                      (202) 514-8126
  *Attorneys*
  *Tax Division*
  *Department of Justice*
  *Post Office Box 502*
  *Washington, D.C. 20044*

## SUMMARY OF THE CASE

## AND REQUEST FOR ORAL ARGUMENT

This federal tax case involves a tax exception limited to "educational organization[s]" that maintain a regular faculty and curriculum for enrolled students. *See* 26 U.S.C. §§170(b)(1)(A)(ii), 514(c)(9)(C)(i). This Court previously held that to qualify for this exception, appellee Mayo Clinic must be organized and operated "exclusively" for "educational rather than other purposes." *Mayo Clinic v. United States*, 997 F.3d 789, 802 (8th Cir. 2021). To satisfy that standard, education must be Mayo's "primary purpose" and its other purposes cannot be "'substantial.'" *Id.* (quoting *Better Bus. Bureau of Wash., D.C. v. United States*, 326 U.S. 279, 283 (1945)). The District Court concluded that Mayo qualified for the limited exception, even though it found that Mayo was organized and operated to <u>both</u> educate students <u>and</u> care for patients and that its patient-care purpose was substantial.

Counsel for the United States respectfully inform the Court that they believe that oral argument may be beneficial, and suggest that 20 minutes per side would be adequate to address the issues.

Appellate Case: 23-2246    Page: 2    Date Filed: 09/01/2023 Entry ID: 5312463

# TABLE OF CONTENTS

**Page**

Summary of the case and request for oral argument ...............................i
Table of contents.................................................................ii
Table of authorities ...........................................................iv
Glossary ........................................................................ix
Jurisdictional statement .........................................................1
Statement of the issues ..........................................................2
Statement of the case ............................................................4

    A.    Procedural Overview...................................................4

    B.    Background...........................................................5

        i.    Tax-exempt organizations ...........................................5

        ii.    §514(c)(9)(C) tax exception ........................................7

        iii.    Educational organizations...........................................9

    C.    Mayo ..............................................................12

    D.    Mayo's tax-refund claims...........................................15

    E.    District Court summary-judgment proceedings...................16

    F.    Prior appeal .......................................................18

    G.    District Court proceedings on remand.............................21

Summary of argument .........................................................25
Argument .......................................................................28

    The District Court erred in concluding that Mayo
    qualifies for a UBIT tax exception that is limited to
    educational organizations.......................................28

    Standard of review ...............................................28

    A.    Introduction........................................................29

Appellate Case: 23-2246    Page: 3    Date Filed: 09/01/2023 Entry ID: 5312463

B.    The District Court erred in concluding that Mayo was an "educational organization" despite its substantial noneducational (i.e., medical) purpose and activities ................................................................. 31

1.    The District Court's findings establish that Mayo is disqualified from being an "educational organization" because it was organized and operated for the substantial purpose of providing medical care to patients ... 33

2.    The District Court's rationale for disregarding Mayo's substantial medical purpose conflicts with *Better Business Bureau* and this Court's prior directive ............. 37

C.    The District Court erred in interpreting "primary" to mean merely "substantial" for purposes of determining whether educating students was Mayo's "primary purpose" ........................................... 47

1.    In the context of §170(b)(1)(A)(ii) and Reg. §1.170A-9(c)(1), "primary" means predominant and not merely substantial ........... 48

a.    Regulation §1.170A-9(c)(1) makes clear that "primary" does not mean merely "substantial" ................................................ 49

b.    Courts have interpreted "exclusively" as used in §501(c)(3) and related statutes to mean more than "substantial" ................................................ 51

Appellate Case: 23-2246    Page: 4    Date Filed: 09/01/2023 Entry ID: 5312463

c. The ordinary meaning of "primary" supports reading Reg. §1.170A-9(c)(1) as requiring more than a "substantial" educational purpose ................................55

d. The District Court's ruling undermines Congress's choice to extend the UBIT exception to educational organizations described in §170(b)(1)(A)(ii) but not to academic medical centers and teaching hospitals described in §170(b)(1)(A)(iii).....58

2. The District Court's rationale for interpreting "primary" to mean merely "substantial" is flawed.........................61

Conclusion.................................................................72
Certificate of compliance .........................................73
Certificate of service ................................................74

## TABLE OF AUTHORITIES

**Cases:**

*Armstrong v. United States*, 366 F.3d 622 (8th Cir. 2004)...............29
*Bartels Trust for Benefit of Cornell Univ. v. United States*,
    617 F.3d 1357 (Fed. Cir. 2010).....................................7, 8
*Better Bus. Bureau of Wash., D.C. v. United States*,
    326 U.S. 279 (1945) ............................i, 3, 4, 9, 10, 19-21, 27, 30-33
                            37-42, 45, 47, 53, 60, 61, 69
*Board of Governors v. Agnew*, 329 U.S. 441 (1947) ......................63-66
*Brundage v. Commissioner*, 54 T.C. 1468 (1970) ...........................11
*Christian Manner Int'l, Inc. v. Commissioner*, 71 T.C. 661
    (1979)...........................................................44
*Dumaine Farms v. Commissioner*, 73 T.C. 650 (1980)...............68, 69

Appellate Case: 23-2246    Page: 5    Date Filed: 09/01/2023 Entry ID: 5312463

Cases (cont'd):                                                      Page(s)

*Fed'n Pharmacy Servs., Inc. v. Commissioner*, 625 F.2d
    804 (8th Cir. 1980)................................................................53

*Francis Edward McGillick Found. v. Commissioner*,
    278 F.2d 643 (3d Cir. 1960)......................................54, 69

*Hutchinson Baseball Enters., Inc. v. Commissioner*,
    73 T.C. 144 (1979), *aff'd*, 696 F.2d 757 (10th Cir. 1982)..............54

*In re Kellogg Brown & Root, Inc.*, 756 F.3d 754
    (D.C. Cir. 2014) ............................................................67

*Living Faith, Inc. v. Commissioner*, 950 F.2d 365
    (7th Cir. 1991).................................................39, 41, 43

*Malat v. Riddell*, 383 U.S. 569 (1966) ...................56, 57, 65

*Mayo Clinic v. United States*, 997 F.3d 789
    (8th Cir. 2021)...........................i, 2, 3, 5, 10, 18-21, 26, 29-33, 35, 41
                           48, 51, 52, 54, 65, 67, 69

*Mayo Foundation for Medical Education & Research v.
    United States*, 562 U.S. 44 (2011) ............................67, 68

*Medtronic, Inc. & Consol. Subs. v. Commissioner*,
    900 F.3d 610 (8th Cir. 2018) ............................................29

*Mun. Bond Corp. v. Commissioner*, 341 F.2d 683
    (8th Cir. 1965)............................................................56

*Ohio Teamsters Educ. & Safety Training Tr. Fund v.
    Commissioner*, 692 F.2d 432 (6th Cir. 1982)................................53

*Redlands Surgical Servs. v. Commissioner*, 113 T.C. 47
    (1999), *aff'd*, 242 F.3d 904 (9th Cir. 2001)......................39, 43, 44

*Senior Citizens Stores, Inc. v. United States*, 602 F.2d 711
    (5th Cir. 1979).............................................................36

*St. David's Health Care Sys. v. United States*,
    349 F.3d 232 (5th Cir. 2003) ..........................................44

*Stoeckel v. Commissioner*, 2 T.C. 975 (1943) ...................55

*Thompson Truck & Trailer, Inc. v. United States*,
    901 F.3d 951 (8th Cir. 2018) ..........................................56

*Turnure v. Commissioner*, 9 B.T.A. 871 (1927) ...........54, 69

*Union Pacific R.R. Co. v. Surface Transp. Bd.*,
    863 F.3d 816 (8th Cir. 2017) ..........................................51

*United States v. Mayo Foundation for Medical Education
    & Research*, 282 F. Supp. 2d 997 (D. Minn. 2003) .......................42

-v-

**Cases (cont'd):**                                                    **Page(s)**

*Univ. of Mass. Med. Sch. Grp. Prac. v. Commissioner*, 74
   T.C. 1299 (1980) ...................................................................... 42

*Univ. of Md. Physicians v. Commissioner*, 41 T.C.M.
   (CCH) 732 (1981) ..................................................................... 42

## Statutes:

Deficit Reduction Act of 1984, Pub. L. 98-369, §1034(a) .................... 8

Internal Revenue Code (26 U.S.C.):

   §119(d)(4)(A)(i)&(ii), (B)(i) ................................................. 46, 59
   §170 ..................................................................................... 6
   §170(b) ................................................................................. 7
   §170(b)(1)(A) ........................................... 10, 11, 46, 57-59, 61
   §170(b)(1)(A)(i)-(ix) ............................................................. 7
   §170(b)(1)(A)(ii) .............................. 2-5, 8-11, 15-20, 26, 28, 29, 32
                           38, 40, 42, 45, 46, 48-52, 57-59, 65, 66, 70
   §170(b)(1)(A)(iii) ......................... 3, 8, 28, 36, 38, 45, 46, 57-59, 61
   §170(c)(2)(B) ................................................................. 6, 52
   §401 ..................................................................................... 8
   §403(b) ................................................................................. 8
   §501 ..................................................................................... 6
   §501(c) ..................................................................... 7, 58, 63
   §501(c)(3) ........................................... 4, 10, 12, 18-20, 29, 42
                           44, 48, 51-53, 55, 58, 68, 70
   §501(c)(25) ........................................................................... 8
   §511 ..................................................................................... 4
   §511(a) ................................................................................. 7
   §§511-514 ........................................................................... 6
   §512 ..................................................................................... 7
   §514 ............................................................................... 5, 8
   §514(c) ................................................................................. 61
   §514(c)(9) ...................................................................... 58, 61
   §514(c)(9)(C) ........................................... 3, 7, 15, 25, 46, 58, 59

Appellate Case: 23-2246    Page: 7    Date Filed: 09/01/2023 Entry ID: 5312463

**Statutes (cont'd):** Page(s)

Internal Revenue Code (26 U.S.C.)(cont'd):

§514(c)(9)(C)(i) ............................2, 4, 5, 7, 10, 15-17, 29, 32, 58, 59
§514(c)(9)(C)(i)-(iv)...........................................................8, 29, 58
§514(c)(9)(C)(ii) .......................................................................8
§514(c)(9)(C)(iii)-(iv) ...............................................................8
§3121(b)(10) ...........................................................................42
§6511(a)...................................................................................1
§6532(a)(1) ..............................................................................1
§7422 ......................................................................................1

Internal Revenue Code of 1954, Pub. L. 83-591,
   §170(b)(1)(A)(i)-(iii) .........................................................7
Miscellaneous Revenue Act of 1980, Pub. L. 96-605,
   §110(a) .............................................................................8
Pub. L. 84-1022, §1 (1956) .........................................................7
Tax Reform Act of 1969, Pub. L. 91-172, §201 (1969) ........................7

28 U.S.C.:

§1291 ......................................................................................1
§1331 ......................................................................................1
§1346(a)(1) ..............................................................................1
§2107(b)...................................................................................1

**Regulations, Rules, and Rulings:**

21 Fed. Reg. 5867 (1956)..........................................................10
23 Fed. Reg. 1759 (1958).............................................10, 49, 66
38 Fed. Reg. 12 (1973)..............................................................11
73 Fed. Reg. 52528 (2008).........................................................11

Fed. R. App. P. 4(a)(1)(B) ...........................................................1
Fed. R. App. P. 4(a)(4)(A)(vi) ......................................................1

Appellate Case: 23-2246   Page: 8   Date Filed: 09/01/2023 Entry ID: 5312463

**Regulations, Rules, and Rulings (cont'd):**                    **Page(s)**

    Rev. Rul. 77-366, 1977-2 C.B. 192 ................................................ 66

    Treasury Regulations (26 C.F.R.):

        §1.170-2(b)(3) ................................................................. 11
        §1.170A-9(c)(1) ........................................ 3, 4, 11, 17, 19, 27, 30-32
                               35, 42, 45, 48-51, 55, 63, 66
        §1.501(c)(3)-1(c)(1) ......................................................... 4, 66
        §1.501(c)(3)-1(d)(3) ............................................................ 20
        §1.501(c)(3)-1(d)(3)(ii) ................................................... 10, 66

**Other Authorities:**

    Liles & Blum, *Development of the Fed. Tax Treatment of*
        *Charities*, 39 Law and Contemporary
        Problems Journal 6 (1975) ............................................... 6

    Merriam-Webster.com Dictionary ..................................................... 56

    Tucker, <u>*Mayo Clinic v. United States*</u>*: Are Tax-Exempt*
        *Academic Medical Centers "Educational*
        *Organizations" Under U.S. Tax Law?*, 39 Rev.
        Banking & Fin. L. 161 (2019) ............................................ 46, 47

Appellate Case: 23-2246    Page: 9    Date Filed: 09/01/2023 Entry ID: 5312463

# GLOSSARY

| | |
|---|---|
| Add. | Appellant's Separate Addendum |
| App. | Appellant's Separate Appendix |
| IRS | Internal Revenue Service |
| Mayo | Appellee Mayo Clinic |
| R.Doc. | District Court record docket entries |
| R.Doc. 331/Op. | District Court Opinion (a copy of which is in the Appellant's Separate Addendum (Add. 1-98) and in the Appellant's Separate Appendix (App. 145-242)) |
| UBIT | unrelated-business-income tax |

Appellate Case: 23-2246   Page: 10   Date Filed: 09/01/2023 Entry ID: 5312463

# JURISDICTIONAL STATEMENT

Mayo Clinic (Mayo) brought this suit, seeking a refund of $11,501,621 in federal income tax for 2003, 2005-2007, and 2010-2012. (App. 35; R.Doc. 1, at 1.)  Before bringing suit, Mayo filed timely refund claims, which the IRS disallowed.  (App. 41; R.Doc. 1, at 7.)  *See* §§6511(a), 6532(a)(1), 7422.[1]  The District Court had jurisdiction under 28 U.S.C. §§1331, 1346(a)(1).

The District Court rendered a final judgment on December 9, 2022, disposing of all claims of all parties.  (R.Doc. 332.)  On January 6, 2023, within 28 days of the entry of that judgment, Mayo moved to clarify the judgment to specify the amount of statutory interest.  (R.Doc. 335.)  *See* Fed. R. App. P. 4(a)(4)(A)(vi).  The court granted Mayo's motion on March 22, 2023 (R.Doc. 357), and amended the judgment on March 24, 2023 (R.Doc. 358).  The Government filed its notice of appeal on May 18, 2023, within the 60 days allowed by Fed. R. App. P. 4(a)(1)(B), (a)(4)(A)(vi).  (App. 143; R.Doc. 362.)  *See* 28 U.S.C. §2107(b).  This Court's jurisdiction over the appeal rests upon 28 U.S.C. §1291.

---

[1]  Unless otherwise indicated, "§" refers to the Internal Revenue Code (26 U.S.C.).  "Reg. §" refers to Treasury regulations (26 C.F.R.).

Appellate Case: 23-2246     Page: 11     Date Filed: 09/01/2023 Entry ID: 5312463

## STATEMENT OF THE ISSUES

The District Court concluded that Mayo qualified for the limited tax exception provided in §514(c)(9)(C)(i) for an "educational organization" described in §170(b)(1)(A)(ii). This Court previously held that, to qualify as an "educational organization," Mayo must be organized and operated "exclusively" for educational purposes. *Mayo Clinic v. United States*, 997 F.3d 789, 802 (8th Cir. 2021). The Court further held that to be organized and operated exclusively for educational purposes required (i) Mayo's educational purpose to be "primary," and (ii) its "other" purposes to not be "substantial" but merely "incidental" to its educational purpose. *Id*. at 800, 802. The District Court found that Mayo has both a substantial educational purpose and a substantial patient-care purpose. The questions presented are:

1.      Whether the District Court erred in concluding that Mayo is an "educational organization" despite its substantial patient-care purpose and activities.

The most apposite authorities are:

*Better Bus. Bureau of Wash., D.C. v. United States*, 326 U.S. 279
(1945)

*Mayo Clinic v. United States*, 997 F.3d 789 (8th Cir. 2021)

§170(b)(1)(A)(ii)

§170(b)(1)(A)(iii)

§514(c)(9)(C)

Reg. §1.170A-9(c)(1)

2.     Alternatively, whether the District Court erred in
interpreting "primary" to mean merely "substantial" for purposes of
determining whether educating students was Mayo's "primary
purpose."

The most apposite authorities are:

*Better Bus. Bureau*, 326 U.S. 279

*Mayo*, 997 F.3d 789

§170(b)(1)(A)(ii)

§170(b)(1)(A)(iii)

§514(c)(9)(C)

Reg. §1.170A-9(c)(1)

## STATEMENT OF THE CASE

### A.    Procedural Overview

Mayo is the parent company of an extensive healthcare system that is generally exempt from income tax under §501(c)(3).  As an organization described in §501(c)(3), however, Mayo is subject to tax on its "unrelated business income."  §511.  (This tax is commonly called UBIT.)  This case concerns a specific exception from UBIT.  That exception is limited to educational organizations that employ faculty to instruct students through a curriculum (described in §170(b)(1)(A)(ii)).  *See* §514(c)(9)(C)(i) (cross-referencing §170(b)(1)(A)(ii)).  For over 60 years, the courts and the Treasury Department have interpreted "educational organization" under §170(b)(1)(A)(ii) and similar statutes to mean an organization primarily serving an educational purpose and only incidentally serving a noneducational purpose.  *E.g.*, *Better Bus. Bureau*, 326 U.S. 279; Reg. §1.170A-9(c)(1); Reg. §1.501(c)(3)-1(c)(1).

Claiming to be an educational organization within the meaning of §170(b)(1)(A)(ii), Mayo filed multimillion-dollar refund claims for the tax it paid on its debt-financed real-property income.  The IRS denied those claims, and Mayo filed this refund suit.  The parties cross-moved

Appellate Case: 23-2246    Page: 14    Date Filed: 09/01/2023 Entry ID: 5312463

for summary judgment. The District Court denied the Government's motion, rejecting its interpretation of §170(b)(1)(A)(ii) and invalidating Reg. §1.170A-9(c)(1). The court also rejected Mayo's interpretation of the statute but nevertheless granted it summary judgment. The Government appealed.

This Court reversed and remanded. It validated most of the regulation, and directed the District Court to determine "whether Mayo's overall purpose and operations establish that it is 'organized and operated exclusively' for educational rather than other purposes." *Mayo*, 997 F.3d at 802. After holding a trial, the District Court found that Mayo was organized and operated for a substantial patient-care purpose and a substantial educational purpose. Based on those findings, the court held that Mayo qualified for §514(c)(9)(C)(i)'s exception as an educational organization. The Government has appealed.

## B. Background

### i. Tax-exempt organizations

This case concerns the meaning of "educational organization" as described in §170(b)(1)(A)(ii), which is incorporated by reference in

§514(c)(9)(C)(i).  Both provisions are part of a comprehensive statutory scheme that generally exempts charities dedicated to certain purposes from income taxation (*see* §501), and provides for the deduction of contributions to certain tax-exempt organizations (some at preferential percentage limitations) (*see* §170), but still imposes tax on certain income that is unrelated to the exempt function (*see* §§511-514).

By way of brief background, certain organizations are exempt from federal income tax, §501(c)(3), and contributions to them are generally deductible by donors, §170(c)(2)(B).  To qualify for these benefits, an organization must (among other things) be organized and operated "exclusively" for certain delineated charitable purposes, including "educational purposes."  §501(c)(3).  These tax benefits are as old as the federal income-tax laws themselves.  *See generally* Liles & Blum, *Development of the Fed. Tax Treatment of Charities*, 39 Law & Contemporary Problems Journal 6 (1975).

Prior to 1954, the charitable deduction for individual donors was limited to 20% of the donor's income.  Liles & Blum, above, at 30-31.  In 1954, the ceiling on an individual's charitable deduction was raised to 30% for contributions to (i) churches, (ii) certain educational

-6-

organizations, and (iii) hospitals.[2]  Internal Revenue Code of 1954, Pub.

L. 83-591, §170(b)(1)(A)(i)-(iii).  Over the years, Congress has amended

§170(b) numerous times, increasing the percentage of the allowable

deduction and adding to the categories of organizations eligible for the

preferential allowable deduction.  *See* Add. 147-152, 169-171, 204-205.

Nine specific categories now qualify for this preferential deduction.  *See*

§170(b)(1)(A)(i)-(ix).  This case turns on the meaning of "educational

organization" as described in §170(b)(1)(A)(ii) and incorporated by

reference in §514(c)(9)(C)(i).

### ii.    §514(c)(9)(C) tax exception

Organizations otherwise exempt from federal taxation pursuant to

§501(c) remain subject to tax on their "unrelated business taxable

income" (as defined in §512).  §511(a).  In particular, a tax-exempt

entity's income from debt-financed real property may be subject to this

tax.  §514.  *See Bartels Trust for Benefit of Cornell Univ. v. United*

---

[2]  The hospital category was expanded in 1956 to include medical research organizations and again in 1969 to include organizations that provide medical education.  *See* Pub. L. 84-1022, §1 (1956); Tax Reform Act of 1969, Pub. L. 91-172, §201 (1969).

Appellate Case: 23-2246     Page: 17     Date Filed: 09/01/2023 Entry ID: 5312463

*States*, 617 F.3d 1357, 1360-1363 (Fed. Cir. 2010) (describing §514's operation and purpose).

In 1980, Congress enacted a limited exception to §514's debt-financed-real-property rules for certain retirement plans (§401 trusts). Miscellaneous Revenue Act of 1980, Pub. L. 96-605, §110(a) (now codified at §514(c)(9)(C)(ii)). In 1984, Congress extended this tax exception to educational organizations described in §170(b)(1)(A)(ii). Deficit Reduction Act of 1984, Pub. L. 98-369, §1034(a) (codified at §514(c)(9)(C)(i)). Congress later extended this exception to two other specific organizations: title-holding companies described in §501(c)(25) and retirement accounts described in §403(b). §514(c)(9)(C)(iii)-(iv).

As discussed in more detail below, of the nine categories of organizations listed in §170(b)(1)(A), only educational organizations described in §170(b)(1)(A)(**ii**) qualify for this limited exception to the debt-financed-real-property rules. §514(c)(9)(C)(i)-(iv). In particular, Congress did not extend the exception to teaching hospitals, medical research organizations, or academic medical centers described in §170(b)(1)(A)(**iii**). These organizations, along with the others listed in §170(b)(1)(A), must pay tax on income from debt-financed real property.

Appellate Case: 23-2246    Page: 18    Date Filed: 09/01/2023 Entry ID: 5312463

### iii.   Educational organizations

When Congress extended the debt-financed-real-property exception to §170(b)(1)(A)(ii) organizations in 1984, it did not legislate on a blank slate.  The term "educational organization" had been defined for federal tax-exemption purposes by the Supreme Court in *Better Business Bureau*.  In that case, the Court addressed whether a nonprofit organization was exempt from federal Social Security taxes. To qualify for exemption, an organization had to be "'organized and operated exclusively'" for certain listed exempt purposes including (as relevant here) "'educational purposes.'"  *Better Bus. Bureau*, 326 U.S. at 282 (quoting the Social Security Act).  According to the Court, an "educational organization" is an organization that (i) is "devoted to educational purposes" and (ii) has no "substantial" noneducational purpose.  *Id*. at 283.  An educational organization could engage in an activity that served dual purposes — one "educational," one "non-educational" — as long as the noneducational purpose was insubstantial.  *Id*.  But, as the Court explained, "the presence of a single non-educational purpose, if substantial in nature, will destroy the

Appellate Case: 23-2246     Page: 19     Date Filed: 09/01/2023 Entry ID: 5312463

exemption regardless of the number or importance of truly educational purposes." *Id.*

The Treasury Department later promulgated regulations that provided a similar test to define the more limited subset[3] of educational organizations described in §170(b)(1)(A)(ii).[4] 23 Fed. Reg. 1759 (1958). These regulations provided that "[a]n 'educational organization' within the meaning of section 170(b)(1)(A) is one whose primary function is the presentation of formal instruction and which normally maintains a

---

[3] Educational organizations described in §170(b)(1)(A)(ii) are a subset of educational organizations that qualify for exemption from the income tax under §501(c)(3) and do "not include all organizations that engage in tax exempt educational activities." *Mayo*, 997 F.3d at 794. Section 170(b)(1)(A)(ii) describes "an educational organization which normally maintains a regular faculty and curriculum and normally has a regularly enrolled body of pupils or students in attendance at the place where its educational activities are regularly carried on." In contrast, any organization that provides some form of instruction on subjects useful and beneficial to the community can qualify as an "educational organization" exempt from tax under §501(c)(3); the instruction need not involve faculty, curriculum, and enrolled students. Reg. §1.501(c)(3)-1(d)(3)(ii), Ex. 4. Such organizations include museums, zoos, and symphony orchestras. *Id.* But educational organizations that provide instruction through faculty and a curriculum for enrolled students — the subset of educational organizations described in §170(b)(1)(A)(ii) — have received additional tax benefits (like the exception in §514(c)(9)(C)(i)) over the years.

[4] These regulations had been subject to public notice and comment. *See* 21 Fed. Reg. 5867 (1956) (proposed regulations).

-10-

regular faculty and curriculum and normally has a regularly enrolled body of pupils or students in attendance at the place where its educational activities are regularly carried on." Reg. §1.170-2(b)(3). The regulations further provided that a §170(b)(1)(A)(ii) educational organization "does not include organizations engaged in both educational and noneducational activities unless the latter are merely incidental to and growing out of the educational activities." *Id*. This regulatory definition was later upheld by the Tax Court. *See Brundage v. Commissioner*, 54 T.C. 1468, 1473-1474 (1970).

After the Tax Court upheld Treasury's definition of "educational organization," Treasury re-codified that definition when it promulgated new regulations defining §170(b)(1)(A) organizations in 1973. 38 Fed. Reg. 12 (1973) (Reg. §1.170A-9(b)(1)). This is the applicable regulation (now codified at Reg. §1.170A-9(c)(1)) in this appeal. *See* 73 Fed. Reg. 52528, 52533 (2008) (redesignating §1.170A-9(b)(1) as §1.170A-9(c)(1)). The substance of the regulatory definition has not changed since first promulgated in 1958.

Appellate Case: 23-2246     Page: 21     Date Filed: 09/01/2023 Entry ID: 5312463

### C.    Mayo

Mayo is a nonprofit corporation that is exempt from federal income tax because it is described in §501(c)(3).  (App. 154-155; R.Doc. 331/Op., at 10-11; Add. 10-11.)  Mayo (and its predecessor) was formed to act as the parent corporation of a very large healthcare organization that includes more than 70 hospitals, medical clinics, and research centers throughout the country.  (*Id.*; App. 82-85; R.Doc. 298, at 1-2.)  In 2010, Mayo reorganized its operations.  (App. 154-155; R.Doc. 331/Op., at 10-11; Add. 10-11.)  Prior to 2010, Mayo (formerly known as Mayo Foundation) provided parent-organization management services for its healthcare subsidiaries but did not directly provide patient care.  (*Id.*)  In 2010, the parent organization merged with one of its wholly owned hospital subsidiaries that directly provided patient care (Mayo Clinic Rochester).  (*Id.*)  After the merger, the resulting organization conducted both patient care and parent-corporation functions.[5]  (App. 38-39; R.Doc. 1, at 4-5.)

Mayo has described its functions in its application for tax exemption and annual information returns.  (App. 154; R.Doc. 331/Op.,

---

[5] The reorganization is irrelevant to the legal issues on appeal.

Appellate Case: 23-2246    Page: 22    Date Filed: 09/01/2023 Entry ID: 5312463

at 10; Add. 10; App. 97-108; R.Doc. 298, at 1-2.)  Prior to the merger,
Mayo represented that it "conduct[s] the usual activities associated with
parent corporations in the tax-exempt healthcare field," including
coordinating system-wide activities, accounting, fund-raising, human
resources, budget planning, legal compliance, and managing the
"investment pool for its subsidiaries."  (App. 154; R.Doc. 331/Op., at 10;
Add. 10.)  After the merger, Mayo represented that it conducts "a
variety of programs in direct patient care" as well as its ongoing
activities as the "parent organization of a multi-entity organization
consisting of hospitals, clinics, health care providers and other entities
providing health care related services."  (App. 101; R.Doc. 298, at 1-2.)

In addition to providing extensive management services for its
healthcare subsidiaries and (after 2009) healthcare for patients, Mayo
also operated five schools through an unincorporated operating division,
the Mayo Clinic College of Medicine, during the tax years at issue.
(App. 167; R.Doc. 331/Op., at 23; Add. 23.)  These schools maintained a
regular faculty and curriculum and normally had an enrolled body of
students in attendance at the place where the educational activities
were carried on.  (App. 168; R.Doc. 331/Op., at 24; Add. 24.)

Appellate Case: 23-2246     Page: 23     Date Filed: 09/01/2023 Entry ID: 5312463

Although Mayo's "main focus is on treating patients" (App. 207; R.Doc. 331/Op., at 63; Add. 63), its world-renowned medical care is provided in an "'integrated environment of practice, research, and education'" (App. 199; R.Doc. 331/Op., at 55; Add. 55 (quoting Mayo report)). As an academic medical center[6] (App. 176; R.Doc. 331/Op., at 32; Add. 32), Mayo integrates its extensive clinical practice with its educational and research functions (App. 194-198; R.Doc. 331/Op., at 50-54; Add. 50-54). The large number of patients seen at Mayo's health clinics and hospitals provide training and research opportunities for Mayo's staff and students. (App. 153; R.Doc. 331/Op., at 9; Add. 9.) Mayo integrates the education provided to students through its schools with the clinical practice provided at its hospitals and other healthcare subsidiaries in order to provide "outstanding healthcare" to its patients.

---

[6] An academic medical center is an organization that includes a health professional school and an affiliated teaching hospital or hospital network. (App. 125-127; R.Doc. 316, at 176-178.) As a multi-purpose facility, it strives to integrate its clinical practice with its educational and research functions. (App. 196-198; R.Doc. 331/Op., at 52-54; Add. 52-54.) Mayo is one of more than 100 academic medical centers operating in the United States. (App. 196; R.Doc. 331/Op., at 52; Add. 52.)

Appellate Case: 23-2246     Page: 24     Date Filed: 09/01/2023 Entry ID: 5312463

(App. 120; R.Doc. 316, at 149; *see* App. 205; R.Doc. 331/Op., at 61; Add. 61.)

### D. Mayo's tax-refund claims

One of Mayo's functions as a parent organization is managing the investment pool for its numerous healthcare subsidiaries. (App. 154; R.Doc. 331/Op., at 10; Add. 10.) In that capacity, Mayo received income from debt-financed real property during the years at issue. (App. 41-42; R.Doc. 1, at 7-8.) As noted above, Mayo was required to pay tax on such income unless it could demonstrate that it qualified for the narrow exception provided in §514(c)(9)(C) for retirement accounts, title-holding organizations, and educational organizations described in §170(b)(1)(A)(ii). Mayo claimed that it qualified as the latter. (*Id*.)

The IRS rejected Mayo's claim. It concluded that Mayo did not qualify as an "educational organization" within the meaning of §170(b)(1)(A)(ii) and §514(c)(9)(C)(i), and therefore owed UBIT on income received from its debt-financed real property. (App. 39-41; R.Doc. 1, at 5-7.) After paying the tax, Mayo filed refund claims totaling approximately $11.5 million for the tax years at issue. (App. 41; R.Doc. 1, at 7.)

Appellate Case: 23-2246    Page: 25    Date Filed: 09/01/2023 Entry ID: 5312463

## E. District Court summary-judgment proceedings

After the IRS denied its refund claims, Mayo brought the instant refund suit. (App. 35-53; R.Doc. 1, at 1-19.) The parties cross-moved for summary judgment regarding whether Mayo qualified as an educational organization under §170(b)(1)(A)(ii) so as to fit within the narrow exception provided in §514(c)(9)(C)(i).

The Government did not dispute that Mayo's medical schools satisfied §170(b)(1)(A)(ii)'s faculty/curriculum/students/place requirements. (R.Doc. 177, at 6.) The Government argued instead that §170(b)(1)(A)(ii) applies only to educational organizations that engage in such activities and not to any organization that, as a non-primary function, maintains schools. (*Id*. at 6-18.) Citing the text of the statute, the Government argued (i) that the plain meaning of "educational organization" as used in §170(b)(1)(A)(ii) is an organization for which education is its predominant purpose and function, and (ii) that Mayo's predominant purpose and function was providing healthcare to patients (and managing subsidiaries that provide such care), not operating schools for students. (*Id*.)

Appellate Case: 23-2246    Page: 26    Date Filed: 09/01/2023 Entry ID: 5312463

The Government alternatively argued that, if the statute were ambiguous, the District Court should defer to Reg. §1.170A-9(c)(1), a regulatory definition that traces back to 1958. (R.Doc. 177, at 19-26.) As noted above, that regulation provides that an organization is not an "educational organization" within the meaning of §170(b)(1)(A)(ii) unless (i) its "primary function is the presentation of formal instruction" and (ii) its "noneducational activities" are "merely incidental to" its "educational activities." Reg. §1.170A-9(c)(1).

The District Court granted Mayo's motion for summary judgment and denied the Government's cross-motion. (R.Doc. 210, at 31.) It concluded that, during the tax years at issue, Mayo was an "educational organization" within the meaning of §170(b)(1)(A)(ii) and therefore qualified for §514(c)(9)(C)(i)'s UBIT exception.

The District Court determined that "the term 'educational organization' is ambiguous" (R.Doc. 210, at 21) and that "the extent to which an organization must engage in education to qualify as 'educational'" is an open "question" (*id*. at 24). It nevertheless rejected Treasury's resolution of that question in Reg. §1.170A-9(c)(1),

Appellate Case: 23-2246    Page: 27    Date Filed: 09/01/2023 Entry ID: 5312463

invalidating "the regulation's primary-function and merely-incidental requirements." (*Id*. at 21.)

After rejecting both parties' definitions of "educational organization," the District Court concluded that "Mayo qualifies as an 'educational organization' under §170(b)(1)(A)(ii) and is entitled to summary judgment on its refund claims." (R.Doc. 210, at 30.) It did so, however, without first defining "educational organization" or addressing the Government's evidence that demonstrated that, at a minimum, there were disputed factual issues regarding the extent of Mayo's educational activities (R.Doc. 155).

## F.    Prior appeal

On appeal, this Court agreed with the Government that the District Court had erred in invalidating the regulation's primary-function and merely-incidental tests. The Court held that the regulation validly "interpret[ed] the statute as requiring that a qualifying organization's primary purpose be 'educational' and that its <u>noneducational</u> activities be merely incidental to that primary purpose." *Mayo*, 997 F.3d at 800. The Court explained that the overarching statutory test for tax-exempt status under §501(c)(3) is whether an

-18-

organization is "organized and operated exclusively" for a charitable purpose, and that the "settled" interpretation of that phrase is an organization whose "'primary purpose' was one or more qualifying charitable uses, and whose noncharitable activities were 'merely incidental' to those purposes." *Id.* And, as the Court further explained, "Congress limited the charitable tax advantage in §170(b)(1)(A)(ii) to only one of the charitable uses enumerated in §501(c)(3)" — "educational" — and, therefore, to come within the scope of §170(b)(1)(A)(ii), an organization must be organized and operated exclusively for "educational" purposes. *Id.*

In so ruling, the Court relied on the *Better Business Bureau* test for educational organizations. *Mayo*, 997 F.3d at 796, 802. The Court also held that Reg. §1.170A-9(c)(1)'s "primary function" and "merely incidental" requirements had a "valid role in interpreting the statute." *Id.* at 799-800. The Court determined, however, that Reg. §1.170A-9(c)(1) went too far in requiring the organization's primary function to be the presentation of "formal" instruction and invalidated that aspect of the regulation. *Id.* at 799-800. In so ruling, the Court held that "the proper frame of reference" for the meaning of "educational" for purposes

-19-

of §170(b)(1)(A)(ii) is the "broad view of a tax-exempt educational purpose" reflected in the regulation defining "educational" for purposes of §501(c)(3). *Id*. at 800. Under that regulation, educational included all types of instruction, whether formal or not. Reg. §1.501(c)(3)-1(d)(3).

The Court remanded the case and directed the District Court to determine whether Mayo was organized and operated "'exclusively' for educational rather than other purposes" by (i) determining the meaning of "primary" and (ii) balancing Mayo's "educational [purpose] against [its] noneducational [purposes]" to determine whether its educational purpose was primary and its noneducational purposes merely incidental. 997 F.3d at 802. The Court observed that "Mayo's status as an academic medical center means that its medical and educational purposes — and the operations supporting those functions — are inextricably intertwined." *Id*. But it further observed that "[s]eparating out the wheat from the chaff — the educational from the noneducational — while difficult, is not impossible." *Id*. Quoting *Better Business Bureau*, the Court emphasized that "'the presence of a single non-educational purpose, if substantial in nature, will destroy the

-20-

[UBIT] exemption regardless of the number or importance of truly educational purposes.'" *Id.* (alteration in original).

## G.    District Court proceedings on remand

On remand, the Government argued that, during the refund years, Mayo was not an educational organization because its noneducational purpose (i.e., patient care) was substantial. (App. 70, 74-75; R.Doc. 258, at 14, 18-19.) The Government further argued that, for purposes of determining whether Mayo's primary purpose was educational, "primary" means "of first importance." (App. 71-74; R.Doc. 258, at 15-18.) Mayo, for its part, argued that "primary" means merely "substantial" in the context here. (App. 135-139; R.Doc. 323, at 101-105.) It further argued that it did not operate for a substantial noneducational purpose because, even though its activities served "other purposes (e.g., healthcare)" (App. 138; R.Doc. 323, at 104), they also served an educational purpose and therefore none of its activities were "solely" noneducational — they all served both educational and noneducational (healthcare) purposes (App. 55-56; R.Doc. 248, at 2, 18).

A trial was held to determine the extent of Mayo's educational and noneducational purposes and activities. During the years at issue,

-21-

Mayo's Articles of Incorporation stated that it was organized for several tax-exempt purposes: "charitable, educational, and scientific purposes." (App. 160; R.Doc. 331/Op., at 16; Add. 16.) According to those Articles, Mayo conducted the "practice of medicine" and "medical research," in addition to "medical education." (App. 161; R.Doc. 331/Op., at 17; Add. 17.) Its Bylaws likewise emphasized all three purposes: "care of the sick," "medical education for better trained doctors," and "research." (App. 162; R.Doc. 331/Op., at 18; Add. 18.) This "three-part mission" also animated Mayo's governance documents. (App. 164; R.Doc. 331/Op., at 20; Add. 20.) As Mayo explained in its Mission Statement: "Mayo will provide the best care to every patient every day through integrated clinical practice, education and research." (App. 166; R.Doc. 331/Op., at 22; Add. 22.)

Mayo's trial witnesses echoed its Mission Statement. Mayo's former Chief Legal Officer (Mr. Oviatt) testified that Mayo's "primary value" was "the needs of the patient come first." (App. 110; R.Doc. 315, at 48.) The former dean of Mayo's Graduate Medical Education School (Dr. Warner) likewise testified that "the needs of the patient is the primary value." (App. 111-113; R.Doc. 315, at 62, 198-199.) Mayo's

Appellate Case: 23-2246    Page: 32    Date Filed: 09/01/2023 Entry ID: 5312463

former CEO (Dr. Noseworthy) concurred, testifying that Mayo's "primary value" was providing "the best care" to "patients."[7] (App. 115-116, 118; R.Doc. 316, at 76-77, 89.)

The District Court concluded that Mayo was an "educational organization" during the refund years. That conclusion was based on the court's determinations that (i) Mayo's "primary purpose" was "educational" (App. 219-229; R.Doc. 331/Op., at 75-85; Add. 75-85), and (ii) Mayo had "no substantial noneducational purpose" (App. 229-230; R.Doc. 331/Op., at 85-86; Add. 85-86).

With regard to its determination of Mayo's "primary purpose," the District Court agreed with Mayo that "primary" means "substantial," rather than "most important." (App. 219-220; R.Doc. 331/Op., at 75-76; Add. 75-76.) It thus held that an organization is organized and operated "exclusively" as an educational organization as long as it has a substantial educational purpose, even if education is not its "most important" purpose. (*Id.*) The court concluded that Mayo was organized and operated exclusively for educational purposes because its

---

[7] Mayo likewise acknowledged in its post-trial brief that its "Primary Value was '[t]he needs of the patient come first.'" (App. 134; R.Doc. 323, at 25.)

-23-

Articles of Incorporation, Bylaws, governance documents, Mission Statement, day-to-day operations, and finances all reflected its "substantial educational purposes." (App. 225-227; R.Doc. 331/Op., at 81-83; Add. 81-83.) In so concluding, the court relied on the fact that Mayo's "education, research, and clinical practice are inextricably intertwined" and that the "health care" provided by Mayo to patients also served an "educational function."[8] (App. 228-229; R.Doc. 331/Op., at 84-85; Add. 84-85.)

With regard to its determination that Mayo had no substantial noneducational purpose, the District Court acknowledged that Mayo's patient-care function "is certainly substantial." (App. 233; R.Doc. 331/Op., at 89; Add. 89.) But, in the court's view, the fact that Mayo's substantial patient care furthers "noneducational purposes" did not preclude the activity from being "exclusively" educational. (App. 232; R.Doc. 331/Op., at 88; Add. 88.) As the court explained, the relevant inquiry (in its view) was not whether a particular activity had "some

---

[8] The District Court noted in a footnote that, even if "primary" means "most important," it would still conclude that Mayo's primary purpose was educational "for the same facts and reasons that led [it] to conclude that education is Mayo's substantial purpose." (App. 229 n.5; R.Doc. 331/Op., at 85 n.5; Add. 85 n.5.)

Appellate Case: 23-2246    Page: 34    Date Filed: 09/01/2023 Entry ID: 5312463

purpose <u>in addition</u> to education" but whether that activity had "<u>no</u> educational purpose" and was substantial. (*Id.*) In other words, the court continued, "[i]f a particular activity furthers <u>both</u> educational <u>and</u> noneducational purposes, that activity may still be 'exclusively' educational for purposes of applying the UBIT [exception]." (*Id.*) The court concluded that the "substantial" patient-care purpose served by Mayo's extensive clinical practice did not disqualify it from being organized and operated exclusively for educational purposes because that practice also served Mayo's educational purpose. (*Id.*)

The District Court concluded that Mayo qualified as an educational organization under §170(b)(1)(A)(ii) for purposes of the UBIT exception provided in §514(c)(9)(C) and granted Mayo's refund claims totaling $11,501,621, plus statutory interest. (App. 242; R.Doc. 331/Op., at 98; Add. 98.) After Mayo moved for clarification, the court amended the judgment to grant Mayo a specific amount of interest. (R.Doc. 358.)

## SUMMARY OF ARGUMENT

Mayo is a world-renowned healthcare organization that operates an extensive network of hospitals and other medical facilities

throughout the United States. For purposes of claiming a narrow exception from the unrelated-business-income tax on the income it received from debt-financed real property, Mayo claimed to be an educational organization described in §170(b)(1)(A)(ii) during the tax years at issue. In a prior appeal, this Court held that Mayo could not qualify for this exception if (i) its educational purpose was not "primary" or (ii) its "other purposes" were "substantial." *Mayo*, 997 F.3d at 802.

On remand, the District Court concluded that Mayo qualified for the limited exception, even though it found that Mayo was organized and operated to <u>both</u> educate students <u>and</u> care for patients and that its patient-care purpose was substantial. In so concluding, the court made two legal errors; the correction of either requires reversal and entry of judgment for the United States.

1. Mayo cannot qualify as an educational organization if it also had a noneducational purpose that was substantial. The Supreme Court made this clear decades ago in *Better Business Bureau*, as the courts — including this Court in the prior *Mayo* appeal — have confirmed. *See Mayo*, 997 F.3d at 802 (stating that the "'presence of a single non-educational purpose, if substantial in nature, will destroy the

-26-

[UBIT] exemption'" that Mayo claimed) (quoting *Better Bus. Bureau*, 326 U.S. at 283) (alteration by this Court). And the governing Treasury regulation, which this Court upheld in relevant part in the prior appeal, states that an educational organization "does not include organizations engaged in both educational and noneducational activities unless the latter are merely incidental to the educational activities." Reg. §1.170A-9(c)(1).

Applying these legal standards to the District Court's findings, it is clear that Mayo was not an "educational organization" because it operated a nationwide network of hospitals for the benefit of its patients and that substantial patient-care purpose was not merely incidental to its educational operations. The court's justification for sidestepping the *Better Business Bureau* test and the regulation cannot withstand scrutiny. The court held that if an activity like patient care served dual purposes — one qualifying (educational) and one nonqualifying (medical) — the nonqualifying purpose could not destroy the qualification, even if (as here) it is substantial. But this reasoning conflicts with *Better Business Bureau*, this Court's prior directive, and every court that has addressed the issue.

Appellate Case: 23-2246    Page: 37    Date Filed: 09/01/2023 Entry ID: 5312463

2.  The District Court further erred as a matter of law in determining that an organization's "primary" purpose is education as long as education is a "substantial" purpose.  As the Government argued below, the weight of authority establishes that "primary" in this context means "of first importance" (i.e., predominant) and not merely substantial.  The District Court's contrary determination conflicts with the language of the relevant statutes and regulations, applicable case law, and dictionary definitions of "primary."  It also erases the distinction Congress made between educational organizations (described in §170(b)(1)(A)(**ii**)) and organizations like teaching hospitals and academic medical centers (described in §170(b)(1)(A)(**iii**)) that operate substantially, but not predominantly, for educational purposes.

## ARGUMENT

### The District Court erred in concluding that Mayo qualifies for a UBIT tax exception that is limited to educational organizations

#### Standard of review

The Government challenges two legal rulings made by the District Court:  (i) that an organization can be an "educational organization" even if it has substantial noneducational purposes and activities, and (ii) that "primary" means merely "substantial" for purposes of

-28-

§170(b)(1)(A)(ii) and §501(c)(3). Both legal conclusions are reviewed de novo. *Medtronic, Inc. & Consol. Subs. v. Commissioner*, 900 F.3d 610, 613 (8th Cir. 2018). As a taxpayer seeking a refund, Mayo bears the burden of proving that it qualifies for the tax exception at issue. *Armstrong v. United States*, 366 F.3d 622, 625-626 (8th Cir. 2004).

## A.  Introduction

This case involves an organization described in §501(c)(3) that earned income on its debt-financed real property. All §501(c)(3) organizations must pay tax on such income unless they fall within an exception, such as one of four narrow exceptions provided in §514(c)(9)(C)(i)-(iv). Mayo claims to qualify for the exception provided in §514(c)(9)(C)(i) for an "educational organization" described in §170(b)(1)(A)(ii).

There is no dispute in this case that Mayo — as an academic medical center — operates for <u>both</u> "medical and educational purposes," as this Court previously recognized. *Mayo*, 997 F.3d at 802. Mayo is the parent organization of a sprawling healthcare system that includes numerous hospitals, clinics, and medical research facilities in more than 70 communities across the country. (App. 154-156; R.Doc.

-29-

331/Op., at 10-12; Add. 10-12; App. 82-85; R.Doc. 298, at 1-2.) Although it operates five medical schools through its unincorporated Mayo Clinic College of Medicine, Mayo also provides, and supports subsidiaries that provide, substantial amounts of patient care. (App. 233; R.Doc. 331/Op., at 89; Add. 89.)

This Court held in the prior appeal that, to qualify for the tax exception at issue, Mayo must establish that (i) its "primary purpose" was educational and (ii) its noneducational purposes were not substantial and were "merely incidental" to its primary purpose of educating medical students. *Mayo*, 997 F.3d at 799-800 (validating Reg. §1.170A-9(c)(1) to the extent that it imposed these two requirements). Under that standard, "'the presence of a single non-educational purpose, if substantial in nature, will destroy [Mayo's refund claim] regardless of the number or importance of truly educational purposes.'" *Id*. at 802. (quoting *Better Bus. Bureau*, 326 U.S. at 283). Accordingly, this Court directed the District Court to "balance" Mayo's "educational" purpose against its "noneducational" purposes and determine (i) whether its educational purpose was "primary" and (ii) whether its

Appellate Case: 23-2246    Page: 40    Date Filed: 09/01/2023 Entry ID: 5312463

"other purposes" were "substantial." *Id.* The District Court failed in both tasks.

As demonstrated below, Mayo did not qualify as an educational organization described in §170(b)(1)(A)(ii) during the years at issue because providing medical care to patients was one of Mayo's "substantial" purposes, as the District Court's findings establish. *See*, below, §B.1. The court's contrary determination is based on the legally erroneous assumption that, if an activity like patient care served dual purposes — one qualifying (educational) and one nonqualifying (medical) — the nonqualifying purpose could not destroy the qualification, even if (as here) it is substantial. *See*, below, §B.2. Moreover, the court further erred as a matter of law in concluding that Mayo's educational purpose need only be substantial, and not predominant, to qualify it as an "educational organization." *See*, below, §C.1-2.

**B.    The District Court erred in concluding that Mayo was an "educational organization" despite its substantial noneducational (i.e., medical) purpose and activities**

As noted above, this Court previously held that both the *Better Business Bureau* test and Reg. §1.170A-9(c)(1)'s merely-incidental

Appellate Case: 23-2246    Page: 41    Date Filed: 09/01/2023 Entry ID: 5312463

limitation apply to determine whether an organization is an "educational organization" under §170(b)(1)(A)(ii) and §514(c)(9)(C)(i). *Mayo*, 997 F.3d at 799-800, 802. Under *Better Business Bureau*, if Mayo had "'a single non-educational purpose'" during the tax years at issue that was "'substantial in nature,'" then it would not qualify for the limited UBIT tax exception, "'regardless of the number or importance of truly educational purposes'" that also animated Mayo's activities. *Id.* (quoting *Better Business Bureau*). The same result is reached under the regulation's "merely incidental" limitation. *See* Reg. §1.170A-9(c)(1) (stating that an educational organization "does not include organizations engaged in both educational and noneducational activities unless the latter are merely incidental to the educational activities").

Under *Better Business Bureau* and the regulation, being organized and operated for multiple purposes — one qualifying and one not — does not necessarily preclude qualification as long as the nonqualifying purpose is insubstantial. As this Court explained, the medical purpose served by Mayo's system-wide parent activities and its nationwide hospital operations would not preclude it from being an educational

-32-

organization as long as that purpose was "'merely incidental to,'" and only a "'means of furthering,'" its "educational purposes." *Mayo*, 997 F.3d at 795, 800 (citation omitted). Thus, the fact that "some of [Mayo's] educational purposes and functions also fall within other charitable categories — and vice versa — would not disqualify it from being an educational organization." *Id.* at 802. But if its noneducational purpose was "'substantial,'" Mayo would be so disqualified. *Id.* at 802 (quoting *Better Business Bureau*). As the Court summed up, the "balance is educational against noneducational." *Id.*

1. **The District Court's findings establish that Mayo is disqualified from being an "educational organization" because it was organized and operated for the substantial purpose of providing medical care to patients**

The findings made by the District Court on remand demonstrate that Mayo was organized and operated for the substantial noneducational purpose of providing medical care to patients. In this regard, the court found:

- Mayo's founders aimed to achieve "the highest quality patient care" (App. 147; R.Doc. 331/Op., at 3; Add. 3);

-33-

- Mayo's "field" was "tax-exempt healthcare" (App. 154; R.Doc. 331/Op., at 10; Add. 10);

- Mayo's Articles of Incorporation stated that it was organized to (among other things) "conduct the practice of medicine" (App. 161; R.Doc. 331/Op., at 17; Add. 17);

- Mayo's Mission Statement provided that it was dedicated to providing "the best care to every patient" (App. 166; R.Doc. 331/Op., at 22; Add. 22);

- Mayo had more than 1 million patient registrations in 2010 (App. 176; R.Doc. 331/Op., at 32; Add. 32);

- Mayo spent $2 billion on patient care in 2007 (App. 186; R.Doc. 331/Op., at 42; Add. 42);

- Mayo's Board of Trustees characterized its "primary business model" as "destination medical care" (App. 199; R.Doc. 331/Op., at 55; Add. 55);

- Mayo envisioned itself as "the premier preferred global healthcare provider" (App. 201; R.Doc. 331/Op., at 57; Add. 57);

Appellate Case: 23-2246    Page: 44    Date Filed: 09/01/2023 Entry ID: 5312463

- Mayo's executives represented that "Mayo Clinic's main focus is on treating patients" and that its "primary mission" was "patient care" (App. 206-207; R.Doc. 331/Op., at 62-63; Add. 62-63); and

- Patient care was a "substantial" purpose of Mayo's operations (App. 233; R.Doc. 331/Op., at 89; Add. 89).

Those findings demonstrate that patient care was a substantial purpose at Mayo and not merely incidental to its educational activities. Because Mayo was organized and operated to provide medical care to patients (App. 161, 199; R.Doc. 331/Op., at 17, 55; Add. 17, 55), and that purpose was "substantial" (App. 233; R.Doc. 331/Op., at 89; Add. 89), Mayo is disqualified from being an educational organization under the *Better Business Bureau* test recited by this Court in the first appeal. *See Mayo*, 997 F.3d at 802.

For similar reasons, Mayo is also disqualified by Reg. §1.170A-9(c)(1)'s "merely incidental" limitation. A noneducational activity or purpose is "merely incidental" to an educational activity or purpose where it is only a "'means of furthering'" its "educational purposes." *Mayo*, 997 F.3d at 795, 800 (citation omitted). Pursuing a nonqualifying

-35-

purpose as an "end in itself rather than merely a means of accomplishing [a qualifying] goal" precludes qualification. *Senior Citizens Stores, Inc. v. United States*, 602 F.2d 711, 714 (5th Cir. 1979). Mayo's patient-care activities were not merely incidental to its educational purpose because patient care was an "end in itself" for Mayo, not merely a means of furthering its educational goals. The District Court did not — and could not — find that Mayo treated patients merely as a means of training doctors. To the contrary, the court's findings establish that Mayo's caring for patients was a substantial goal in itself (App. 161, 166, 199, 206-207; R.Doc. 331/Op., at 17, 22, 55, 62-63; Add. 17, 22, 55, 62-63) — an activity that served a "medical or hospital care" purpose, §170(b)(1)(A)(iii). Those findings are confirmed by multiple sources, including Mayo's Articles of Incorporation ("practice of medicine") (App. 161; R.Doc. 331/Op., at 17; Add. 17), its Mission Statement ("best care to every patient") (App. 166; R.Doc. 331/Op., at 22; Add. 22), and testimony by its executives that serving patients — and providing them the best care possible — was Mayo's "primary value" (App. 110-113, 116-118, 120; R.Doc. 315, at 48, 62, 198-199, R.Doc. 316, at 77, 81, 89, 149).

-36-

### 2. The District Court's rationale for disregarding Mayo's substantial medical purpose conflicts with *Better Business Bureau* and this Court's prior directive

The District Court concluded (App. 233; R.Doc. 331/Op., at 89; Add. 89) that being organized and operated for a "substantial" medical purpose could not render Mayo ineligible for the UBIT tax exception unless its extensive patient care (and its supporting management functions) served no educational purpose. That conclusion is incorrect. As the Supreme Court made clear in *Better Business Bureau*, even if an activity served an "educational purpose," that same activity nevertheless "destroyed" qualification as an educational organization if it also served <u>another purpose</u> (e.g., promoting "a profitable business community") that was "substantial." 326 U.S. at 283. In other words, an activity that served dual purposes — i.e., serving both educational and noneducational purposes — precludes an organization from being an "educational organization" if the noneducational purpose is substantial and not merely incidental. This Court endorsed this foundational point in the prior appeal. *Mayo*, 997 F.3d at 802 (holding that a "'single non-educational purpose, if substantial in nature, will

-37-

destroy the [UBIT] exemption"') (quoting *Better Bus. Bureau*, 326 U.S. at 283) (alteration in original).

The District Court failed to follow this binding precedent. It dismissed the fact that "Mayo has other purposes," deeming it not "dispositive." (App. 232; R.Doc. 331/Op., at 88; Add. 88.) The court was wrong. Having "other purposes" precludes qualification where (as here) those purposes are "'substantial,'" as both the Supreme Court and this Court have explained. *Mayo*, 997 F.3d at 802 (quoting *Better Bus. Bureau*, 326 U.S. at 283). Although "'treating patients'" and "'instructing students'" may frequently occur "'simultaneously'" at Mayo (App. 234; R.Doc. 331/Op., at 90; Add. 90 (citation omitted)), those activities serve distinct purposes: providing both (i) medical care to patients and (ii) medical education to students. And providing <u>both</u> medical care to patients <u>and</u> medical education to students is a qualifying purpose under §170(b)(1)(A)(**iii**), but not under §170(b)(1)(A)(**ii**). *See Mayo*, 997 F.3d at 796 n.5 (explaining that the term "'[e]ducational organization' isolates taxpayers exempt because they are 'organized and operated exclusively' for educational purposes as opposed to other charitable purposes").

Appellate Case: 23-2246   Page: 48   Date Filed: 09/01/2023 Entry ID: 5312463

That Mayo integrated its "three mission activities" (App. 194, 208;
R.Doc. 331/Op., at 50, 64; Add. 50, 64) — clinical practice, education,
and research — does not mean that the resulting integrated activity
served only one purpose (education). "A single activity may be carried
on for more than one purpose." *Living Faith, Inc. v. Commissioner*, 950
F.2d 365, 370 (7th Cir. 1991). If an organization is engaged in a single
activity that is "directed toward multiple purposes, both exempt and
nonexempt," and "the nonexempt purpose is substantial in nature,"
then "the organization will not satisfy the operational test." *Redlands
Surgical Servs. v. Commissioner*, 113 T.C. 47, 71 (1999), *aff'd*, 242 F.3d
904 (9th Cir. 2001).

To illustrate, take the seminal decision, *Better Business Bureau*.
The Supreme Court concluded that the Better Business Bureau did not
qualify as an "educational organization" because "an important"
purpose of the organization was promoting a "profitable business
community." 326 U.S. at 283. The fact that the organization furthered
business interests by "educat[ing]" that community, and thereby
integrated its educational and business purposes, did not preserve tax-
exempt status because the presence of that substantial business

-39-

purpose "destroyed" any claim that "education is the sole aim of" the organization.  *Id*. at 284.

This analysis applies equally here.  Mayo's integrated activity served multiple purposes, one qualifying under §170(b)(1)(A)(ii) (educating medical students) and others nonqualifying under §170(b)(1)(A)(ii) (caring for its medical patients and conducting research).  The District Court should have addressed whether Mayo's medical-care purpose was substantial, and not merely incidental to Mayo's educational purpose, so as to preclude Mayo from qualifying as an educational organization.[9]  As this Court directed, if Mayo is organized and operated for a purpose "other" than education, and that other purpose is "'substantial,'" then Mayo is disqualified from being an "educational organization," regardless of the "'importance of [its] truly

---

[9] As demonstrated above (§B.1), the District Court's findings establish that Mayo was organized and operated for a substantial medical purpose.  Indeed, Mayo never argued otherwise, asserting only that its extensive clinical practice and supporting management functions were also organized and operated for educational purposes and that therefore none of its substantial activities were "solely" noneducational.  (App. 56; R.Doc. 248, at 18.)  But, as explained in the text, "solely" noneducational is not the test under *Better Business Bureau*.

Appellate Case: 23-2246     Page: 50     Date Filed: 09/01/2023 Entry ID: 5312463

educational purposes.'" 997 F.3d at 802 (quoting *Better Business Bureau*).

That Mayo's "medical and educational purposes are inextricably intertwined" (App. 231; R.Doc. 331/Op., at 87; Add. 87) does not immunize it from the *Better Business Bureau* test or the regulatory merely-incidental limitation, as the District Court wrongly assumed. As explained above, a "single activity may be carried on for more than one purpose," and if a nonqualifying purpose is substantial, the qualification is destroyed. *Living Faith*, 950 F.2d at 370. This Court recognized this principle in the prior appeal. *Mayo*, 997 F.3d at 802. There, the Court observed that "Mayo's status as an academic medical center means that its medical and educational purposes" are "inextricably intertwined." *Id.* But the Court nevertheless directed — in the very next sentence — that the "noneducational" and "educational" purposes be "[s]eparat[ed]" and "balance[d]" for purposes of determining whether Mayo was an educational organization. *Id.* And, the Court further instructed, that required separation and evaluation was not "impossible," though it might be "difficult." *Id.*

Appellate Case: 23-2246    Page: 51    Date Filed: 09/01/2023 Entry ID: 5312463

The District Court disregarded this Court's directive by refusing to separately evaluate Mayo's "educational" and "other" purposes in order to determine whether Mayo's noneducational purposes were substantial and therefore disqualifying. Its conclusion (App. 232; R.Doc. 331/Op., at 88; Add. 88) that an activity that "furthers <u>both</u> educational <u>and</u> noneducational purposes" is nevertheless "exclusively" educational — even if the noneducational purpose is "substantial" — conflicts with *Better Business Bureau*, Reg. §1.170A-9(c)(1), and this Court's prior ruling.[10]

_____

[10] To support its refusal to follow this Court's directive, the District Court relied (App. 231; R.Doc. 331/Op., at 87; Add. 87) on *United States v. Mayo Foundation for Medical Education & Research*, 282 F. Supp. 2d 997 (D. Minn. 2003). The court's reliance was misplaced because that case addresses a different issue and a different statute, §3121(b)(10). Section 3121(b)(10) exempts from Social Security taxes certain income earned by students. The case did not concern (as here) whether Mayo qualified as an "educational organization" under §170(b)(1)(A)(ii); rather, it concerned the different statutory question of whether Mayo's medical residents qualified as "students" under §3121(b)(10). The court also relied (App. 233; R.Doc. 331/Op., at 89; Add. 89) on Tax Court cases concluding that medical organizations that were organized and operated "exclusively for charitable, scientific, and educational purposes" qualified as §501(c)(3) organizations. *Univ. of Md. Physicians v. Commissioner*, 41 T.C.M. (CCH) 732 (1981); *Univ. of Mass. Med. Sch. Grp. Prac. v. Commissioner*, 74 T.C. 1299, 1304 (1980). Those cases do not support the District Court's analysis because §170(b)(1)(A)(ii) — unlike §501(c)(3) — focuses on <u>one</u> specified purpose (educational).

-42-

The District Court's analysis also disrupts what was previously well-settled case law. Prior to the court's ruling, courts addressing whether an organization was organized and operated exclusively for an exempt purpose uniformly had evaluated whether the organization's nonexempt purpose was substantial, even if it was intertwined with the organization's exempt purpose and activities. *Living Faith* illustrates this foundational point. There, an organization that was organized and operated for religious purposes operated vegetarian restaurants and health food stores in furtherance of its religious mission. *Living Faith*, 950 F.2d at 367. Although that activity served a religious purpose, it was also "imbued with a substantial commercial purpose." *Id.* at 371. The presence of the substantial nonexempt commercial purpose precluded exemption as an organization organized and operated exclusively for religious purposes. *Id.* at 376.

Further examples abound. For instance, in *Redlands* the organization at issue engaged in a single activity — providing health care — that served both a "charitable purpose" and a non-charitable purpose ("profit-making objectives"). 113 T.C. at 78. The Tax Court concluded that the organization was "not operated exclusively for

-43-

charitable purposes" within the meaning of §501(c)(3) because the profit-making purpose was substantial and there was "no obligation to put charitable purposes ahead of profit-making objectives." *Id.* at 78, 92-93. *See also Christian Manner Int'l, Inc. v. Commissioner*, 71 T.C. 661, 668 (1979) (holding that, if an organization's "activity was engaged in to further both an exempt and nonexempt purpose," then the court "must decide whether the nonexempt purpose was sufficient[ ] to deny the exemption or was so incidental to the exempt purpose as not to disqualify" the exemption).

What these cases illustrate — and what the District Court failed to recognize — is that it is insufficient for Mayo to show that all or almost all of its activities served an educational purpose. Rather, Mayo additionally must show that those same activities did not also serve a noneducational purpose in more than an incidental way. *See St. David's Health Care Sys. v. United States*, 349 F.3d 232, 237 (5th Cir. 2003) (explaining that "we do not simply consider whether the organization's activities further its charitable purposes. We must also ensure that those activities do <u>not</u> substantially further other (non-charitable) purposes").

Appellate Case: 23-2246    Page: 54    Date Filed: 09/01/2023 Entry ID: 5312463

In sum, the fact that Mayo — like other academic medical centers — integrated its clinical practice with its educational and research activities does not mean that it was organized and operated exclusively for educational purposes. Rather, it only means that those various endeavors operated as a single activity. But, as noted above, a single activity can serve dual purposes, and it is the presence of the second, noneducational purpose that disqualifies Mayo from being an educational organization because that second purpose (medical care) was "substantial," *Better Bus. Bureau*, 326 U.S. at 283, not "merely incidental," Reg. §1.170A-9(c)(1). Although the medical-care and educational purposes were intertwined, they were nevertheless distinct purposes, only one of which qualifies under §170(b)(1)(A)(ii).

Indeed, Congress enacted a separate provision for organizations that operate for the dual purposes of providing medical education and medical care — organizations described in §170(b)(1)(A)(iii). Although such organizations are not organized and operated primarily for educational purposes, and thus are not described in §170(b)(1)(A)**(ii)**, they can be organized and operated primarily for the dual purposes of

-45-

providing "medical education" and "medical care," §170(b)(1)(A)(**iii**). And — critically — the UBIT exception provided in §514(c)(9)(C) specifically applies <u>only</u> to organizations described in subpart (ii) of §170(b)(1)(A) and <u>not</u> to organizations described in subpart (iii) of §170(b)(1)(A). If Congress had wanted to extend the UBIT exception at issue to both types of organizations, it could have done so as it has elsewhere in the Code. *See* §119(d)(4)(A)(i)&(ii), (B)(i) (extending an exception to <u>both</u> educational organizations described in §170(b)(1)(A)(ii) <u>and</u> "academic health center[s]" described in §170(b)(1)(A)(iii)).

The District Court's expansion of §170(b)(1)(A)(ii)'s educational organization category to include academic medical centers like Mayo has broad ramifications. There are more than 100 organizations in the United States that describe themselves as academic medical centers, and more than 1,000 teaching hospitals, as Mayo's expert acknowledged. (App. 126, 129; R.Doc. 316, at 177, R.Doc. 317, at 48.) *See* Tucker, <u>*Mayo Clinic v. United States*</u>: *Are Tax-Exempt Academic Medical Centers "Educational Organizations" Under U.S. Tax Law?*, 39 Rev. Banking & Fin. L. 161, 173-174 (2019) (observing that

(i) "education is not the <u>primary</u> purpose of an [academic medical center's] work under a commonsense understanding of the word 'primary'" and (ii) an academic medical center's "non-educational activities (like patient care)" are more than "'merely incidental'"). And, like Mayo, these organizations frequently generate large amounts of income from real-property investments that, but for the limited UBIT exception extended by the District Court to Mayo, would otherwise be subject to tax. *Id.* Nothing in the text or context of the statute indicates that Congress intended to sweep an entire industry of healthcare organizations into a narrow exception specifically limited to educational organizations.

### C. The District Court erred in interpreting "primary" to mean merely "substantial" for purposes of determining whether educating students was Mayo's "primary purpose"

In addition to failing to apply the *Better Business Bureau* test to the findings in this case, the District Court further erred as a matter of law in interpreting the term "primary" to mean merely "substantial" for

-47-

Appellate Case: 23-2246    Page: 57    Date Filed: 09/01/2023 Entry ID: 5312463

purposes of determining Mayo's primary purpose or function.[11] (App. 219-220; R.Doc. 331/Op., at 75-76; Add. 75-76.) As this Court explained, an organization is not organized and operated "exclusively" for "educational" purposes within the meaning of §170(b)(1)(A)(ii) and §501(c)(3), unless its "primary purpose" is educational and all of its other purposes are "merely incidental to that primary purpose." *Mayo*, 997 F.3d at 800; *accord* Reg. §1.170A-9(c)(1). In that context, "primary" must mean more than "substantial." *See*, below, §C.1. The District Court's contrary ruling is incorrect. *See*, below, §C.2.

### 1. In the context of §170(b)(1)(A)(ii) and Reg. §1.170A-9(c)(1), "primary" means predominant and not merely substantial

The Government's interpretation of "primary" to mean more than merely "substantial" is supported by the relevant statutory and regulatory provisions, case law, dictionary definitions, and Congress's election to extend the UBIT tax exception to §170(b)(1)(A)(ii) educational organizations but not to §170(b)(1)(A)(iii) academic medical centers and teaching hospitals (even though their educational activities

---

[11] Although Reg. §1.170A-9(c)(1) refers to "primary function" and the case law refers to "primary purpose," the two phrases are interchangeable. *See Mayo*, 997 F.3d at 800.

-48-

are substantial).  As those sources indicate, in the context here, primary means of first importance or principal (i.e., predominant).

> ### a. Regulation §1.170A-9(c)(1) makes clear that "primary" does not mean merely "substantial"

Regulation §1.170A-9(c)(1) and its predecessors have long required an "educational organization" described in §170(b)(1)(A)(ii) to have the provision of education as its "primary function."  *See* 23 Fed. Reg. 1759, 1761 (1958).  The regulation defines the scope of that primary educational function by contrasting it with the organization's permitted noneducational function.  In this regard, the regulation — after setting out the "primary function" requirement — provides that an "[educational organization] does not include organizations engaged in both educational and noneducational activities unless the latter are merely incidental to the educational activities."  Reg. §1.170A-9(c)(1) (emphasis added).  By explicitly disqualifying organizations that engage in both educational and noneducational activities unless the latter are "merely incidental" to the former, the regulation makes clear that primary means all but insubstantial functions.  In other words, if an organization's noneducational purposes and activities must be "merely

-49-

incidental," then its educational purposes and activities must — by definition — be predominant as compared to the contrasting subordinate incidental ones.  In this way, the regulatory "merely incidental" limitation forecloses interpreting "primary" to mean merely "substantial."

That interpretation of primary is supported by other language in Reg. §1.170A-9(c)(1).  The regulation provides that "[a]n educational organization is described in section 170(b)(1)(A)(ii) if <u>its</u> primary function" is providing education.  Reg. §1.170A-9(c)(1) (emphasis added).  By using the pronoun "its" before "primary function," as opposed to "<u>a</u> primary function" or "<u>one of its</u> primary functions," the regulation indicates that education must be <u>the</u> singular primary function of the organization and thus must be more than substantial.  An organization may have multiple substantial functions but only one singular function that is primary.  As Mayo's expert witness explained, if primary is defined as "substantial," then an organization like Mayo could have "multiple primary functions," with each function representing one third of the organization's activities and purposes.  (App. 130-132; R.Doc. 317, at 56-58.)  If two thirds of an organization's

-50-

activities and purposes are in furtherance of something other than education, then it could not be said that education is <u>the</u> singular function of the organization.  The use of "its" to modify "primary" forecloses interpreting primary to mean merely "substantial."

> **b.** **Courts have interpreted "exclusively" as used in §501(c)(3) and related statutes to mean more than "substantial"**

The broader context of §170(b)(1)(A)(ii) and Reg. §1.170A-9(c)(1) confirms that "primary" does not mean merely substantial.  *See Union Pacific R.R. Co. v. Surface Transp. Bd.*, 863 F.3d 816, 825 (8th Cir. 2017) (holding that legal text should not be read in "isolation" but can only be understood in "context").  The "primary function" requirement in Reg. §1.170A-9(c)(1) is derived from the definition of "exclusively" as used in §501(c)(3), as this Court explained in the prior appeal, *Mayo*, 997 F.3d at 800, and that context precludes interpreting "primary" to mean merely "substantial."

In upholding the validity of the "primary function" requirement in Reg. §1.170A-9(c)(1), this Court traced the requirement's statutory basis to §501(c)(3)'s foundational standard for tax-exempt educational organizations, i.e., that they be "'organized and operated <u>exclusively</u>' for

-51-

… educational purposes." *Mayo*, 997 F.3d at 799-800 (quoting §170(c)(2)(B)) (emphasis added). As the Court explained, the term "exclusively" as used to delineate tax-exempt status has long been interpreted to mean "primarily." *Id*. at 795-796. And although an organization that operates for multiple exempt purposes can qualify under §501(c)(3), as long as — taken together — those purposes constitute the organization's exclusive/primary function, *Mayo* 997 F.3d at 795, to qualify under §170(b)(1)(A)(ii), the organization must operate for "only <u>one</u>" specific purpose — educational, *id*. at 800 (emphasis added). Therefore, to qualify as a §170(b)(1)(A)(ii) "educational organization," an organization's primary purpose must be educational and all of its other purposes — including other purposes that support exemption under §501(c)(3), such as charitable patient care or scientific research — can only be "incidental" to the organization's educational purpose. *Id*.

A substantial exempt purpose has never — until the District Court's ruling here — been sufficient to satisfy §501(c)(3)'s "exclusively" threshold requirement for tax exemption. To the contrary, courts have applied the term "substantial" as a <u>maximum ceiling</u> for <u>nonexempt</u>

Appellate Case: 23-2246    Page: 62    Date Filed: 09/01/2023 Entry ID: 5312463

purposes — i.e., only insubstantial nonexempt purposes were permitted for exemption under §501(c)(3) — and never as a <u>minimum floor</u> for <u>exempt</u> purposes.  *E.g., Fed'n Pharmacy Servs., Inc. v. Commissioner*, 625 F.2d 804, 807 (8th Cir. 1980) ("'The test of 'exclusivity' has been defined by Treasury Regulations and case law to mean that a substantial nonexempt purpose or activity will disqualify the organization's exempt status, but insubstantial nonexempt activities do not destroy the exemption.'") (citation omitted).  In *Better Business Bureau*, the Court did not have to address the extent of the organization's exempt purpose because — no matter how strong that exempt purpose was — its nonexempt purpose was "substantial" and thus disqualifying.  326 U.S. at 283.  Most courts have followed the approach taken in *Better Business Bureau*, focusing on whether the nonexempt purpose was substantial so as to exceed the maximum ceiling on nonexempt functions rather than on the degree of the exempt purpose.  *E.g., Ohio Teamsters Educ. & Safety Training Tr. Fund v. Commissioner*, 692 F.2d 432, 436 (6th Cir. 1982) (holding that the "critical inquiry" is whether the organization has "any substantial non-charitable purpose").

Appellate Case: 23-2246     Page: 63     Date Filed: 09/01/2023 Entry ID: 5312463

Courts that have addressed the minimum floor for the exempt purpose have examined an organization's "predominant purpose" to determine whether it is organized and operated exclusively for the exempt purpose. *Mayo*, 997 F.3d at 796 (quoting *Francis Edward McGillick Found. v. Commissioner*, 278 F.2d 643, 646 (3d Cir. 1960)). *E.g.*, *Hutchinson Baseball Enters., Inc. v. Commissioner*, 73 T.C. 144, 154 (1979) (determining that an organization was organized and operated "exclusively" for an exempt purpose because its "predomina[nt] motivation" for engaging in its activities was "an exempt purpose"), *aff'd*, 696 F.2d 757 (10th Cir. 1982); *Turnure v. Commissioner*, 9 B.T.A. 871, 874 (1927) (concluding that an organization was organized and operated exclusively for exempt purposes based on its "predominant purpose").

Interpreting primary to mean "predominant" fits well with the "merely incidental" limitation on nonexempt purposes and activities developed in the case law and codified in the regulations. As the Tax Court long ago explained, to qualify for tax exemption, an organization's exempt purpose must be "predominant" and "of such importance or significance as to reduce the [nonexempt] aspect to the point where it

-54-

was only incidental." *Stoeckel v. Commissioner*, 2 T.C. 975, 979 (1943). Interpreting primary to mean merely substantial does not capture the necessary inverse relationship between the exempt and nonexempt functions required by the statutory term "exclusively."

Inasmuch as "primary" is part of the definition of the statutory term "exclusively," it must be given a meaning that does justice to the term that Congress chose for delineating organizations that qualify for tax exemption under §501(c)(3). Although — as this Court correctly recognized — "exclusively" has not been interpreted "literally" to mean solely or only, *Mayo*, 997 F.3d at 795, courts have nevertheless enforced Congress's intent to limit tax exemption to organizations that are in all but only "incidental" ways organized and operated for exempt purposes, *id.* at 795-796 (collecting cases). Interpreting "primary" to mean predominant — and not merely substantial — satisfies this high bar.

### c. The ordinary meaning of "primary" supports reading Reg. §1.170A-9(c)(1) as requiring more than a "substantial" educational purpose

As demonstrated above, the relevant regulation and case law (indirectly) define "primary" to mean all but only incidental nonqualifying purposes and activities — i.e., predominant. That

-55-

definition is consistent with the ordinary meaning of "primary" set out in dictionaries. *See Thompson Truck & Trailer, Inc. v. United States*, 901 F.3d 951, 953 (8th Cir. 2018) (relying on a dictionary definition for a term's "ordinary" meaning). When used as an adjective, the ordinary meaning of "primary" is "of first rank, importance, or value." Merriam-Webster.com Dictionary (defining primary), https://www.merriam-webster.com/dictionary/primary (last visited August 23, 2023).

This Court has previously relied on dictionary definitions to interpret the similar term "primarily" as used in the federal tax laws. *Mun. Bond Corp. v. Commissioner*, 341 F.2d 683, 688 (8th Cir. 1965) (interpreting the Internal Revenue Code's definition of capital asset). It concluded that "primarily" "is unambiguous and has a well-recognized and understood meaning … 'of first importance or principally.'" *Id.*

The Supreme Court made the same point the following year in *Malat v. Riddell*, 383 U.S. 569 (1966), where it interpreted the same Code provision. The Court rejected the argument that primarily means "substantial," holding that statutes "'should be interpreted where possible in their ordinary, everyday senses'" and, as such, "'primarily' means 'of first importance' or 'principally.'" *Id.* at 571-572 (citation

-56-

omitted).  The Court emphasized that this interpretation of primarily is particularly appropriate where the statute's purpose is to "differentiate" one thing from another.  *Id*. at 572.

*Malat*'s interpretation of primarily is instructive here.  Section 170(b)(1)(A) differentiates nonprofit organizations by their activity, and, in that context, it makes sense that the differentiating activity would be the principal activity that sets that organization apart from other organizations that may engage in that same activity to some extent but not in a principal way.  As this Court explained, the binary question posed by §170(b)(1)(A)(ii) and the related case law is "educational against noneducational."  *Mayo*, 997 F.3d at 802.  And, in that context, interpreting primary to mean principally or predominantly best isolates educational organizations described in §170(b)(1)(A)(ii) from all other organizations listed in §170(b)(1)(A) (including "medical or hospital care" organizations described in § 170(b)(1)(A)(iii)).

Appellate Case: 23-2246     Page: 67     Date Filed: 09/01/2023 Entry ID: 5312463

> **d.** **The District Court's ruling undermines Congress's choice to extend the UBIT exception to educational organizations described in §170(b)(1)(A)(ii) but not to academic medical centers and teaching hospitals described in §170(b)(1)(A)(iii)**

Finally, the limited nature of the exception provided in §514(c)(9)(C)(i) makes clear that Congress did not intend to except from UBIT every organization that operates for a substantial, but not predominant, educational purpose. As noted above, all §501(c)(3) organizations are generally subject to tax on income from debt-financed real property that they acquire. Of the dozens of types of tax-exempt organizations (*see, e.g.*, §501(c)) that are subject to that tax, Congress chose to except only four specific types in §514(c)(9)(C).

As originally enacted, §514(c)(9) provided an exception for only certain retirement plans. *See*, above, p.8. Congress subsequently expanded this limited exception slightly to include four specific "qualified organizations." §514(c)(9)(C)(i)-(iv). Tellingly, only one of the nine different types of tax-exempt organizations listed in §170(b)(1)(A)

-58-

— educational organizations described in §170(b)(1)(A)(ii)[12] — is deemed a qualified organization for purpose of the limited tax exception provided in §514(c)(9)(C). Congress specifically chose not to provide an exception from the debt-financed income rules for any other category of organization described in §170(b)(1)(A).

Of particular significance, the debt-financed-real-property exception does not extend to teaching hospitals or academic medical centers described in §170(b)(1)(A)(iii), even though such organizations provide "medical education." Thus, by its plain terms, §514(c)(9)(C)(i) does not include all organizations that engage in educational activity; it includes only organizations that qualify under §170(b)(1)(A)(ii) by being organized and operated predominantly for educational purposes. This disparate exclusion is strong proof that Congress deliberately chose not to extend the exception to organizations, like Mayo, that are organized and operated for the dual purposes of caring for patients and instructing medical students. *Cf.* §119(d)(4)(A)(i)&(ii), (B)(i).

---

[12] Section 514(c)(9)(C)(i) also includes certain "affiliated support organizations" of §170(b)(1)(A)(ii) organizations but Mayo does not claim to be an affiliated support organization.

Appellate Case: 23-2246     Page: 69     Date Filed: 09/01/2023 Entry ID: 5312463

The relevance of Congress's choice is illustrated by *Better Business Bureau*. The question there was whether the Better Business Bureau, a tax-exempt business league, qualified for a Social Security tax exemption that was limited to corporations "'organized and operated exclusively for … scientific … or educational purposes.'" 326 U.S. at 282 (omissions in original). The organization claimed to qualify as "educational." In rejecting that claim, the Supreme Court observed that the Social Security tax exemption under consideration "was drawn almost verbatim" from the Code provision "dealing with exemptions from income taxation." *Id.* at 284. The Court stated, "[s]ignificantly . . . Congress did not write into the Social Security Act certain other exemptions embodied in the income tax provisions, especially the exemption in Section 101(7) of 'business leagues, chambers of commerce, real-estate boards, or boards of trade.'" *Id.* Noting that the Better Business Bureau "closely resembles such organizations," *id.*, the Court concluded that Congress's "manifest desire to include only [educational and scientific organizations] within the" scope of the Social Security tax exemption "prevents us from construing the language of that section to include an organization like petitioner," *id.* at 285.

Appellate Case: 23-2246   Page: 70   Date Filed: 09/01/2023 Entry ID: 5312463

So too here.  Congress drew from §170(b)(1)(A), which lists nine different types of tax-exempt organizations, in deciding which organizations to except from the debt-financed-real-property rules of §514(c).  It did not incorporate an exception for §170(b)(1)(A)(iii) medical organizations that "closely resemble[ ]" Mayo.  As the Supreme Court did in *Better Business Bureau*, this Court should give effect to Congress's "manifest desire" to extend the §514(c)(9) exception to only one of the several organizations described in §170(b)(1)(A):  educational organizations but not hospitals (or medical research organizations operated in conjunction with a hospital) that integrate medical education into their operations as a substantial (but not predominant) function.

### 2. The District Court's rationale for interpreting "primary" to mean merely "substantial" is flawed

In interpreting "primary" to mean merely "substantial," the District Court never came to terms with the fact that it was robbing the statutory term "exclusively" of its intended meaning.  And its analysis is founded on a misreading of the case law, the legislative and judicial history, and the Government's position on the issue.

Appellate Case: 23-2246     Page: 71     Date Filed: 09/01/2023 Entry ID: 5312463

**a.** Beginning with the Government's position, the District Court's assertion (App. 224; R.Doc. 331/Op., at 80; Add. 80) that the Government did not "seriously oppose[ ]" the interpretation of "primary" to mean "substantial" is incorrect. This Court clearly understood that the Government opposed that interpretation in the prior appeal, 997 F.3d at 802, and that opposition was renewed on remand in the Government's trial court brief (App. 71-74; R.Doc. 258, at 15-18). The Government did not repeat the argument in its post-trial proposed findings of fact and conclusions of law (R.Doc. 324), because — as the Government explained during the post-trial argument — the District Court did not need to decide what "primary" means, given that there was no dispute that Mayo's patient-care purpose was "substantial" and that undisputed fact disqualified Mayo from being an educational organization (App. 141-142; R.Doc. 361, at 34-35). *See*, above, §B. But, as the Government reiterated during the post-trial argument, "primary" cannot be interpreted as "substantial" (as Mayo argued) because "[i]n the regular usage 'primary' means first in order of importance, number one." (App. 142; R.Doc. 361, at 35.)

Appellate Case: 23-2246    Page: 72    Date Filed: 09/01/2023 Entry ID: 5312463

**b.** In addition to misconstruing the Government's position, the District Court also misconstrued the relevant case law. The cases cited by the court (App. 219-222; R.Doc. 331/Op., at 75-78; Add. 75-78) do not support interpreting "primary" to mean merely "substantial" rather than "predominant," "principal," or "most important" for purposes of §170(b)(1)(A)(ii) and §501(c).

The main case cited by the District Court, *Board of Governors v. Agnew*, 329 U.S. 441 (1947), supports the Government's — not Mayo's — interpretation of "primary." In *Agnew*, the Court recognized that "primary" "often means first, chief, or principal" when referencing a "single subject." *Id.* at 446. That general rule applies here because, in Reg. §1.170A-9(c)(1), "primary" is referencing a single subject — education. Although the Court in *Agnew* declined to give "primary" its common meaning, and instead interpreted the word "primarily" to mean "substantially," it did so because a literal interpretation was not appropriate given the specific statute there, the Banking Act of 1933. *Id.* at 448-449. That statute applied the term "primarily" to <u>multiple</u> activities, prohibiting persons "'primarily engaged in the issue, flotation, underwriting, public sale, or distribution, at wholesale or

-63-

Appellate Case: 23-2246     Page: 73     Date Filed: 09/01/2023 Entry ID: 5312463

retail, or through syndicate participation, of stocks, bonds, or other similar securities'" from simultaneously serving at an affiliated bank. *Id.* at 443. Focusing on facts unique to the banking industry, the Court explained that persons who engage in underwriting "also engage" in the other listed activities, performing "a substantial amount of each." *Id*. at 446-447.

Other facts unique to the Banking Act supported the Court's uncommon interpretation of "primarily." In holding that a firm is primarily engaged in the underwriting business if its underwriting business is substantial, the Court relied on the statute's "purpose" — to prevent conflicts of interest — and concluded that conflicts could arise "whether [or not] the firm's underwriting business exceeds 50 per cent of its total business." *Agnew*, 329 U.S. at 447. Finally, the Court observed that the Banking Act addressed "several types of underwriting firms" including "those 'primarily engaged' in underwriting" and also "those 'engaged principally' in underwriting." *Id*. at 448 (emphasis added). Given that Congress intended to draw a "distinction" between those firms, the Court refused to "obliterate" that intent "by reading 'primarily' to mean 'principally.'" *Id.*

Appellate Case: 23-2246    Page: 74    Date Filed: 09/01/2023 Entry ID: 5312463

In relying on *Agnew*, the District Court failed to appreciate that the text and context of §170(b)(1)(A)(ii) differ significantly from that of the Banking Act. In most contexts, and particularly in the Internal Revenue Code, "primarily" means "principally," as the Court later emphasized in *Malat* when distinguishing *Agnew*. 383 U.S. at 571-572. The District Court attempted to distinguish *Malat* by positing (App. 224; R.Doc. 331/Op., at 80; Add. 80) that (i) "primarily" means principally or first in importance only when a statute distinguishes between "two taxpayer circumstances," and (ii) the "issue here is not binary." That attempt falls flat. As in *Malat*, the issue here is binary — an organization is either educational or noneducational, as this Court emphasized in the prior appeal. *See Mayo*, 997 F.3d at 802 ("The balance is educational against noneducational."). And the task remanded to the District Court was to "[s]eparat[e]" the "educational from the noneducational" and determine whether Mayo's educational purpose was primary and its noneducational purpose no more than incidental. *Id*. In that binary context, primary must mean principal or first (i.e., predominant).

-65-

Finally, *Agnew* did not involve long-standing regulations that make clear that primary means predominant, not merely substantial, as is the case here. For over 60 years, Treasury regulations have provided that a §170(b)(1)(A)(ii) educational organization "does not include organizations engaged in both educational and non-educational activities unless the latter are merely incidental to" the "educational activities." 23 Fed. Reg. at 1761; Reg. §1.170A-9(c)(1); *see also* Reg. §1.501(c)(3)-1(c)(1).[13] As explained above (§C.1.a), the regulatory

---

[13] Ignoring Reg. §1.170A-9(c)(1)'s merely-incidental limitation on noneducational activities, the District Court relied (App. 220; R.Doc. 331/Op., at 76; Add. 76) on Reg. §1.501(c)(3)-1(d)(3)(ii), Ex. 4 to support its holding that primary means substantial. The court's reliance is misplaced. That regulation lists "[m]useums, zoos, planetariums, symphony orchestras, and other similar organizations" as examples of "educational organizations," if "they otherwise meet the requirements of this section." Reg. §1.501(c)(3)-1(d)(3)(ii). The court incorrectly assumed that such organizations do not have education as their "most important" purpose because they can be entertaining. (App. 220; R.Doc. 331/Op., at 76; Add. 76.) As the regulatory requirements make clear, museums and like organizations only qualify as "exclusively" educational organizations if (among other things) their noneducational purposes — including any "entertainment" purpose (*id*.) — is merely "insubstantial." Reg. §1.501(c)(3)-1(c)(1); *see* Rev. Rul. 77-366, 1977-2 C.B. 192 (holding that an organization that engaged in activities that served both educational and entertainment purposes (educational tours) was not organized and operated exclusively for educational purposes).

-66-

"merely incidental" limitation forecloses interpreting "primary" to mean merely "substantial."

The other two cases cited by the District Court (App. 221-222; R.Doc. 331/Op., at 77-78; Add. 77-78) lend no support to its interpretation of "primary." *In re Kellogg Brown & Root, Inc.*, 756 F.3d 754 (D.C. Cir. 2014) involved neither exempt organizations nor a tax statute, addressing instead the contours of the attorney-client privilege. The court there concluded that the judicial "primary purpose" test did not require a showing that seeking legal — as opposed to business — advice was the dominant purpose for an attorney-client communication because making that evaluation was neither "useful" nor "feasible." *Id*. at 759. Here, in sharp contrast, balancing qualifying versus nonqualifying — specifically, educational versus noneducational — purposes is not only useful and feasible, but is also <u>required</u> by the statutes, regulations, and case law at issue, including this Court's directive in the prior appeal.[14] *See Mayo*, 997 F.3d at 802. The

_____

[14] A similar determination was required in *Mayo Foundation for Medical Education & Research v. United States*, 562 U.S. 44 (2011). There, Mayo had to demonstrate that its medical residents were primarily engaged as students, rather than employees, as a predicate to
(continued…)

-67-

inapposite judicial test for attorney-client protections sheds no light on the legal analysis required here.

Finally, *Dumaine Farms v. Commissioner*, 73 T.C. 650 (1980), does not support the District Court's erroneous conclusion that an organization is operating exclusively for a qualifying purpose as long as it is substantially — rather than predominantly — doing so. In *Dumaine Farms*, the organization at issue operated a demonstration farm in order to (i) research farming methods that conserved the land and (ii) educate the public about those methods. The Tax Court determined that the organization qualified for exemption under §501(c)(3) because it was organized and operated "<u>entirely</u> for exempt purposes" — "scientific purposes" and "educational purposes" both "within the meaning of section 501(c)(3)." *Id*. at 667-669 (emphasis added). The court further determined that the organization was not

_____

claiming the student exemption from the Social Security taxes at issue. That exemption required the parties "to distinguish between workers who study and students who work" by determining whether the "educational aspect of the [employer-employee] relationship" was "predominant" compared to the "service" aspect. *Id*. at 58-59. Applying that test to Mayo's residency program — which integrated education and work (patient care) — may have been difficult, but it was not impossible and was required under the statute at issue.

-68-

organized or operated for the "substantial nonexempt purpose of farming for profit." *Id.* at 669. As the court explained, any profit achieved by the organization was merely "incidental" to its exempt purposes and was "not a goal in and of itself." *Id.* at 661. Far from adopting the District Court's novel exclusive-means-substantial standard, the Tax Court's analysis was a straightforward application of *Better Business Bureau* where a "substantial" amount of a nonexempt purpose can disqualify an organization from exemption but the organization's exempt purpose must dominate the nonexempt ones, which can be no more than incidental.

**c.** Nor does the "legislative and judicial history" cited by this Court in the earlier appeal support interpreting "exclusively" and "primary" to mean merely "substantial," as the District Court suggested (App. 222-223; R.Doc. 331/Op., at 78-79; Add. 78-79). To the contrary, that history supports looking to an organization's "'predominant purpose'" to determine whether it is sufficiently organized and operated for exempt purposes, not to its substantial purpose. *Mayo*, 997 F.3d 795-796 (quoting *Turnure*, 9 B.T.A. at 874 and *McGillick Found.*, 278 F.2d at 646). Nothing in the history cited by the Court supports

-69-

watering down "exclusively" and "primary" to mean merely substantial. To do so would strip the Congressionally intended limitation inherent in the statutory term "exclusively" — §501(c)(3)'s foundational standard for tax-exempt educational organizations — of all meaning.

**d.** Finally, the District Court's alternative conclusion — briefly noted in a footnote — that Mayo's educational operations satisfied the primary purpose test even "[i]f 'primary' meant 'most important'" (App. 229 n.5; R.Doc. 331/Op., at 85 n.5; Add. 85 n.5) does not carry the day for Mayo. Even if Mayo's most important purpose was education, it nevertheless is disqualified from being an educational organization within the meaning of §170(b)(1)(A)(ii) because its noneducational purposes were substantial. *See*, above, §B.

Moreover, the District Court's alternative legal conclusion conflicts with the court's findings. Although the court stated that its alternative conclusion was based on the same "facts and reasons that led [it] to conclude that education is Mayo's substantial purpose" (App. 229 n.5; R.Doc. 331/Op., at 85 n.5; Add. 85 n.5), none of the court's findings evidence that education was more important than patient care at Mayo. To the contrary, the court credited the testimony of Mayo's

-70-

CEO that <u>none</u> of its "three mission activities" — patient care, education, and research — was "more important than the other." (App. 208; R.Doc. 331/Op., at 64; Add. 64.) And other findings made by the court suggest that, of Mayo's three purposes — caring for patients, educating medical students, and researching — the patients came first: Mayo's avowed "mission" was to "provide the best care to every patient" (App. 166; R.Doc. 331/Op., at 22; Add. 22), and a "range of Mayo Clinic executives" represented that "Mayo Clinic's main focus is on treating patients" (App. 207; R.Doc. 331/Op., at 63; Add. 63).

To the extent that the District Court was relying on its finding that "Mayo's educational functions are inextricably intertwined with its other functions" (App. 228; R.Doc. 331/Op., at 84; Add. 84), that finding does not illustrate education's predominance. From this fact, it could just as easily be concluded that medical care (or research) is Mayo's most important function and purpose. Or, as Mayo's CEO testified (App. 119; R.Doc. 316, at 100) and the court elsewhere observed (App. 208; R.Doc. 331/Op., at 64; Add. 64), Mayo's three activities are "equal with none being more important than the other." At most the court's findings demonstrate that it was not possible to determine which of

-71-

Mayo's purposes ranked first.  And, as the party with the burden of proof, Mayo — not the Government — bears the cost of any such impossibility.

## CONCLUSION

The judgment of the District Court should be reversed and judgment should be entered for the United States, or alternatively, the case should be remanded.

Respectfully submitted,

DAVID A. HUBBERT
  *Deputy Assistant Attorney General*

/s/ Judith A. Hagley

| FRANCESCA UGOLINI | (202) 514-3361 |
| JUDITH A. HAGLEY | (202) 514-8126 |

  *Attorneys*
  *Tax Division*
  *Department of Justice*
  *Post Office Box 502*
  *Washington, D.C. 20044*

SEPTEMBER 1, 2023

# CERTIFICATE OF COMPLIANCE

## Certificate of Compliance With Type-Volume Limit, Typeface Requirements, and Type-Style Requirements

1.  This document complies with the word limit of Fed. R. App. P. 32(a)(7)(B) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f):

[X]   this document contains 12,733 words, **or**

[ ]   this brief uses a monospaced typeface and contains _____ lines of text.

2.  This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

[X]   this document has been prepared in a proportionally spaced typeface using Word for Microsoft 365 in Century Schoolbook 14, **or**

[ ]   this brief has been prepared in a monospaced typeface using _____ with _____.

3.  Pursuant to Eighth Circuit Rule 28A(h)(2) and 28A(g)(5), I further certify that the brief and addendum have been scanned for viruses using Microsoft Windows Defender (updated daily), which reports that the files are virus-free.

(s)  /s/ Judith A. Hagley

*Attorney for Appellant United States*

Dated: September 1, 2023

Appellate Case: 23-2246    Page: 83    Date Filed: 09/01/2023 Entry ID: 5312463

## CERTIFICATE OF SERVICE

I hereby certify that on this 1st day of September, 2023, I

electronically filed a PDF version of the foregoing brief with the Clerk of

the Court for the United States Court of Appeals for the Eighth Circuit

by using the CM/ECF system.  I further certify that all participants in

the case are registered CM/ECF users and that service will be

accomplished by the CM/ECF system.

/s/ Judith A. Hagley
*Attorney for Appellant United States*

Appellate Case: 23-2246   Page: 84   Date Filed: 09/01/2023 Entry ID: 5312463